# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

JUSTIN NOEL ALLEN,

          Defendant.

Case No. 25-cr-1029-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

————————————

## TABLE OF CONTENTS

Page

I.     INTRODUCTION..................................................................1

II.    FINDINGS OF FACT.........................................................2

    A.    The Search Warrant ...................................................2

    B.    Inv. Sitzmann's Testimony..........................................5

    C.    Inv. Leitzen's Body Camera Video .............................9

III.   DISCUSSION.................................................................14

    A.    The Parties' Arguments .............................................14

    B.    Relevant Law ............................................................17

    C.    Analysis.....................................................................20

        1.    Whether Inv. Leitzen's entry into the basement violated
              Defendant's Fourth Amendment rights .............................20

1

**2.** *Whether the warrant affidavit contains probable cause without the evidence attributed to Inv. Leitzen* ...................................**21**

**3.** *Whether the good faith exception to the exclusionary rule applies* .........................................................................**23**

***IV.*** ***CONCLUSION*** .............................................................................**31**

## I. INTRODUCTION

On June 24, 2025, the Grand Jury returned an Indictment charging Defendant with one count of Manufacture of a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C) and one count of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(B). (Doc. 3.)

The matter before me is Defendant's motion to suppress. (Doc. 28.) Attached to the motion is Dubuque County Sheriff's Office case report list of items filed as Defendant's inventory of items to be suppressed. (Doc. 28-1.) These items were located in Defendant's residence and appear to be associated with drug manufacturing. The Government filed a timely response. (Doc. 33.) Defendant filed a timely reply to the Government's response. (Doc. 36.) The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on September 18, 2025. (Doc. 37.)

At the hearing, Government Exhibit 1, a Search Warrant dated October 14, 2024, was admitted without objection.

2

The Government called Dubuque County Sheriff's Investigator Matthew Sitzmann[1] as a witness. I found him credible.

At the hearing, the following Defendant's Exhibits A and B were admitted without objection:

A. Search Warrant dated October 14, 2024; and

B. Investigator Leitzen's body camera footage.

For the following reasons, I respectfully recommend that the District Court **grant** Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

On October 14, 2024, City of Dubuque Police Department ("DPD") and Fire Department personnel were dispatched to Defendant's residence, the basement of a single-family home.[2] After Defendant was resuscitated from an apparent drug overdose, he was taken to a hospital and law enforcement obtained a warrant to search his residence. There are three principal sources to examine to set out the necessary facts: 1) the warrant law enforcement obtained to search Defendant's residence; 2) the testimony of Inv. Sitzmann; and 3) the body-worn camera footage of Inv. Leitzen.

### A. The Search Warrant

Because the principal issue before the Court is whether the warrant contained probable cause, I start with Inv. Sitzmann's affidavit in support of the search warrant:

1. On October 14, 2024 at 12:09 pm, Dubuque Police and Dubuque Fire were dispatched to [XXX] Clarke Drive for a report of a possible heroin overdose. On arrival, Dubuque Police Officers located the victim, Justin

---

[1] Inv. Sitzmann has been employed by the Dubuque County Sheriff's Office since 2005 and is an investigator with the Dubuque Drug Task Force ("DDTF"). (Sitzmann Hr'g Test. at 2-3.) He has been with the DDTF since 2021.

[2] Another person resided in the upstairs portion of the residence. The only entrance to the basement residence was from the rear of the house through an exterior door common to both residences and then down a stairway. The upstairs residence has separate access through a door at the top of these stairs.

Allen ([DOB]) unconscious in the basement of the residence. Officers then administered Naloxone to Allen which yielded positive results. Allen did regain consciousness. Allen subsequently walked out to the ambulance under his own power. He was then transported to Finley Hospital for evaluation.

*2. DDTF Inv. Leitzen responded to scene to assist. While in the basement of the residence, Inv. Leitzen observed drug related items in plain view. Inv. Leitzen observed used syringes on a stand in the bedroom. Inv. Leitzen also observed burnt tin foil on the dresser and a glass pipe with burnt residue on the bed. A digital scale with a gem bag containing a white powder on the scale was observed on the dresser.*

3. [PF] was identified as the 911 caller. [PF] reported that he had called 911 when Allen went unconscious. [PF] reported that he didn't witness Allen use any illegal narcotics but appeared under the influence when he arrived at Allen's residence.

4. The investigation further determined that Allen rents and resides in the basement of the residence, [XXX] Clarke Drive.

5. Inv. Soppe spoke with Allen at the hospital. Allen reported that he doesn't know what he took but stated he did use something to attempt suicide.

6. Through my training and experience I know that Naloxone will only be effective on a person with opiates in their system and that Naloxone works by blocking the effects of opiates on the brain to restore breathing.

7. I believe there is currently evidence of drug use, some of which may have contributed to Allen's apparent drug overdose, inside the residence of [XXX] Clarke Drive, Dubuque, Iowa 52001.

8. The Dubuque Drug Task Force respectfully requests permission to search the basement of the residence of [XXX] Clarke Drive, Dubuque, Iowa 52001 for the items and person requested with this search warrant.

4

(Gov't Ex. 1, emphasis added.)  Paragraph 2 describes what Investigator Chad Leitzen from the DPD saw when he entered the residence prior to the issuance of the warrant. Defendant concedes that the warrant establishes probable cause, if and only if paragraph 2 is included.  (Hr'g Tr. at 66.)  The Government did not quite concede that paragraph 2 must be excised from the warrant, but it offers no justification for Inv. Leitzen's warrantless presence in Defendant's home and argues, as discussed in detail below, that (1) even without paragraph 2, the warrant nevertheless establishes probable cause; and (2) the intrusion was "close enough to the line of validity" to make *Leon* applicable. (Hr'g Tr. at 73-74.)

**B.     *Inv. Sitzmann's Testimony***

Inv. Sitzmann described how the DDTF investigators respond to reported drug overdoses.  (Sitzmann Hr'g Test. at 4.-5.  Currently, and for the last 2-3 years, the DDTF primarily sees fentanyl and opiate overdoses.  (*Id*. at 5.)  In Inv. Sitzmann's experience he knows opiate users ingest opiates by injection, inhaling, or by pills.  (*Id*. at 6.)  Inv. Sitzmann believes most opiate use occurs at private residences and that users do not generally exhaust their opiate supply in one sitting and may leave residue of their consumption.  (*Id*. at 7.)  Inv. Sitzmann believes "any overdose from an opiate is rapid onset, and the respiratory depression begins pretty quickly" and usually within 15 minutes of using an opiate.  (*Id*. at 8.)[3]  Inv. Sitzmann testified that how quickly an overdose occurs may depend on how it is consumed, e.g., a reaction from injection occurs more

---

[3] As I noted above, I found Inv. Sitzmann to be credible and I do not intend for the following to reflect on his credibility.  While a law enforcement officer may have extensive practical experience, a comparison of how long it takes for opiate ingestion to result in symptoms of an overdose, such as respiratory distress, seems better suited for medical or scientific testimony than the sort of conclusions that Inv. Sitzmann reached from his personal observations.  In other words, while I am not skeptical about the accuracy of Inv. Sitzmann's candor or the accuracy of his observations, I am skeptical that the Court was presented sufficient evidence to conclude how long it "typically" takes for symptoms of an overdose to appear.

quickly than smoking or ingestion.[4]  (*Id.* at 41-42.)  Inv. Sitzmann testified that these are all common means of consuming opiates.  (*Id.* at 53.)

Inv. Sitzmann acknowledged that another investigator, Inv. Soppe, had learned that Defendant purchased blue M-30 pills that are opioids which can be consumed orally. (*Id.* at 44.)  Inv. Sitzmann was unaware of this information when he applied for the search warrant.  (*Id.* at 45.)  Inv. Sitzmann admitted he did not know when Defendant took the drugs or when he entered the residence.  (*Id.*)  Inv. Sitzmann opined based on his training and experience that an overdose typically occurs where the drug was used, and it is uncommon to ingest drugs and change locations prior to experiencing an overdose.  (*Id.* at 52.)

Inv. Sitzmann described how the DDTF divides up investigative duties following a reported drug overdose, such as responding to the scene or the hospital, to "speed up" the investigation and "have the scene held as short a period of time as possible and the investigation can move forward smoothly."  (*Id.* at 10.)

Inv. Sitzmann was on duty on October 14, 2024 when he heard the 911 dispatcher's report of a possible drug overdose at Defendant's residence on Clarke Drive, in Dubuque, Iowa.  Part of the 911 call was played during the hearing, but not made part of the record.  The person who called 911, PF, reported that he did not know what Defendant had taken but it was possibly heroin.  (*Id.* at 54-55.)  Inv. Sitzmann heard from the radio dispatcher that there was a possible heroin overdose.  (*Id.* at 52.)  Inv. Sitzmann did not review the 911 recording prior to submitting his warrant affidavit.  (*Id.* at 25.)  In other words, it is unclear who attached "possible heroin overdose" to the incident, but it was neither PF nor Inv. Sitzmann.

---

[4] The use of terms relating to "ingesting" drugs was not always consistent.  "Smoking" and "injecting" were clear enough.  Sometimes "ingesting" was used to indicate swallowing a pill and sometimes it was used to cover whatever means the drug was consumed.  *See* Sitzmann Hr'g Test. at 53.

A call for service occurred at 12:09 p.m. (*Id.* at 18.) Inv. Leitzen and Inv. Soppe responded to the scene while Inv. Sitzmann remained in his office to begin gathering identifying information for a search warrant, if it proved necessary. Inv. Sitzmann learned that DPD patrol officers had located Defendant and administered Naloxone (also called "Narcan"), after which Defendant regained consciousness. Inv. Sitzmann testified that an opiate overdose "begins to shut down" the user's respiratory system, but Narcan will block that effect to permit the respiratory system "to continue working again." (*Id.* at 14.) Defendant was then transported to Finley Hospital. At the hospital, Defendant told investigators that he was not sure what he had taken and alluded to having made a suicide attempt. Investigators understood this to have been a narcotic or controlled substance. (*Id.* at 16.) Inv. Sitzmann testified that Narcan is only effective against opiate overdoses. (*Id.* at 17.)

At the scene, officers spoke with PF who had been in Defendant's residence. PF did not witness Defendant "use anything" but appeared under the influence of some substance and PF called 911 when Defendant became unconscious. (*Id.* at 16.)

Inv. Sitzmann testified that he reviewed part of Inv. Letizen's body-camera footage from the incident and that it depicts, among other things, Inv. Leitzen on the phone with Inv. Sitzmann at about 12:35 p.m. (*Id.* at 17-18.) Inv. Leitzen reported he had seen drug-related items at the scene including syringes, burned tin foil, a glass pipe with burned residue, and a digital scale with a gem bag containing white powder. (*Id.* at 19.) Inv. Sitzmann used this information to prepare a search warrant. (*Id.*) The protocol (apparently in Dubuque County) is to complete the affidavit portion and submit it for review by the Dubuque County Attorney's Office. (*Id.*) If approved by the County Attorney, the application and affidavit are submitted electronically through "Docusign." (*Id.* at 20-21.) The County Attorney asked for one change regarding the term

"Naloxone." The County Attorney approved the warrant application at 1:37 p.m.[5] The application was then submitted and approved by Judge Bitter at 1:46 p.m. (*Id.* at 20, 26.)

Inv. Sitzmann offered the opinion that even without Inv. Leitzen's observations, there would be probable cause for the warrant based on possible heroin overdose and the statements of PF. (*Id.* at 23.)

Inv. Sitzmann admitted that although the warrant application sought items related to illicit drug sales and trafficking, law enforcement had no information Defendant was involved in drug sales. (*Id.* at 31-32.) Inv. Sitzmann admitted that Inv. Leitzen, who was on the scene, muted his body worn camera while calling Inv. Sitzmann. (*Id.* at 33.) Inv. Sitzmann cannot recall what was discussed during this muted conversation. (*Id.*) Inv. Sitzmann believes he only spoke with Inv. Letizen once at the scene. (*Id.* at 53.)

Inv. Sitzmann admitted that he assumed that Inv. Letizen made his observations while assisting EMTs and not based on something Inv. Letizen told him. (*Id.* at 34-35.) Inv. Sitzmann acknowledged that the affidavit's statement "DDTF Inv. Leitzen responded to the scene to assist" reasonably and fairly to suggest that "task force Officer Leitzen made those observations while assisting EMTs." (*Id.* at 36.) Although Inv. Sitzmann did not review all of Inv. Leitzen's body-worn camera video, he later became aware that Inv. Leitzen entered the basement after the responding EMTs and Defendant had already left. (*Id.*) Inv. Leitzen is not an EMT, but members of the patrol officers and DDTF

---

[5] The Docusign stamps show very short intervals for review by the County Attorney and Judge Bitter. This is somewhat misleading. The County Attorney apparently received the proposed affidavit and reviewed it prior to and outside the Docusign system. (Sitzmann Hr'g Test. at 50-51.) The short interval for review by a county attorney who had previously seen the affidavit and a judge who no doubt is familiar with the forms and likely concentrates on the testimony to establish probable cause, is not troubling under these circumstances.

members carry Naloxone/Narcan to administer if they are first on the scene. (*Id.* at 57, 63.)

The warrant was executed by members of the DDTF including Inv. Sitzmann, Inv. Leitzen, Inv. Soppe, and Inv. Williams. (*Id.* at 60, 64.)

**C.      Inv. Leitzen's Body Camera Video**

Inv. Leitzen's exited his vehicle at the scene at 12:17 p.m. on October 14, 2024. (Def. Exhibit B at 12:17.)   As Inv. Leitzen walked up a driveway to the rear of the residence (i.e., XXX Clarke Drive in Dubuque, Iowa) EMT vehicles were parked in the driveway and on the street.   Inv. Leitzen could be heard talking (possibly dictating) the time and location. (*Id.* at 12:18.)   At the rear of the house, Inv. Leitzen encountered two uniformed patrol officers and PF standing outside the open rear door of the residence. (*Id.*)   Inv. Leitzen's interview with PF begins at 12:18:22.[6]

Among other things, PF tells Inv. Leitzen:

- PF has known him (presumably Defendant) for a few years but is not really close with him.[7]   PF wanted to be supportive. (*Id.* at 12:18:22-40.)

---

[6] I will make an attempt to describe who is coming and going from the residence.   During the discussion, an apparent EMT exited the back door of the residence. (Def. Exhibit B at 12:19:42. Someone in plain clothes entered the residence and went down the steps toward the basement. (*Id.* at 12:20:03.)   For reasons discussed below, I believe this is Inv. Soppe.   The Government acknowledged, "I believe that officer to go down around the 12:20 mark, and then come out of the residence after at around the 12:26 minute marker on the video, and then inform Investigator Leitzen of what he observed." (Hr'g Tr. at 81.)   Someone walked up from the basement and stood in the doorway during the interview with PF at 12:22:51.   This person seems to have handcuffs on his belt and may be law enforcement.   An apparent EMT emerged from the basement and exited the back door at 12:23:29 followed by another EMT or law enforcement officer at 12:23:33.   Four more EMTs and one law enforcement officer then emerged from the basement. (Def. Exhibit B at 12:23:44 - 12:23:59.)   Also, given his attire and the fact that he appears to encumbered by medical equipment, Defendant may be seen exiting the basement at 12:23:51.

[7] It may not be a necessary fact, but descriptions of PF as a "Good Samaritan" are apt.   Even if he was not close to Defendant, he appears to have saved Defendant's life by visiting him and calling 911.

9

- Defendant was sweating badly when PF arrived. (*Id.* at 12:18:55)

- 15 minutes after PF arrived and saw Defendant was sweating, Defendant went to sit down and then laid back and put his blanket over his head. (*Id.* at 12:19:48.)

- PF checked to see if Defendant was awake. When Defendant was nonresponsive PF called an ambulance right away. (*Id.* at 12:19:53-12:20:01.)

- PF did not see Defendant take anything but saw "it" was in the house. (*Id.* at 12:20:04-10.)

- PF had been there for 40-50 minutes. (*Id.* at 12:20:18.)

- Defendant was there when PF arrived. (*Id.* at 12:20:20.)

- Defendant lives in the basement. (*Id.* at 12:20:28-32.)

- Only Defendant and PF were in the basement. (*Id.* at 12:20:41.)

- Defendant was not using while PF was present. (*Id.* at 12:21:07.)

- Defendant seemed "out of it" when PF arrived. (*Id.* at 12:21:17.)

- No one else arrived or left while PF was at the residence. (*Id.* at 12:21:44.)

- PF did not know if the overdose was intentional, but Defendant seemed depressed about court proceedings. (*Id.* at 12:22:23.)

- PF had seen drug paraphernalia in the basement. (*Id.* at 12:22:31-37.)

- PF assumed Defendant was using heroin. (*Id.* at 12:22:41-48.)

- Defendant had been talking about killing himself the day before. (*Id.* at 12:23:37-41.)

- PF brought his backpack with him to Defendant's residence and had left it in the basement. (*Id.* at 12:24:00.)

- PF was searched at 12:24:39 and found to have no contraband.

10

- PF believed someone lived in the upstairs of the residence and PF had heard that person moving around. (*Id.* at 12:25:13-15.)

PF's backpack became something of a MacGuffin; i.e., "an object, event, or character in a film or story that serves to set and keep the plot in motion despite usually lacking intrinsic importance." *MacGuffin*, Merriam-Webster, https://www.merriam-webster.com/dictionary/MacGuffin (last visited October 28, 2025). PF wanted his backpack so he could leave. Inv. Leitzen had concerns about the backpack containing contraband or other evidence. And, most crucially, someone would have to retrieve the backpack from the basement which was an active crime scene for which law enforcement had no warrant. PF certainly seemed like a legitimate Good Samaritan, but Inv. Leitzen was apparently reluctant to let PF enter the crime scene alone to retrieve the backpack. In fairness, Inv. Leitzen also appeared reluctant to deprive PF of his backpack for an extended period.

Inv. Leitzen told PF he would probably apply for a search warrant for the basement, and everything down there would need to stay. (Def. Exhibit B at 12:25:30.) PF then volunteered to let Inv. Leitzen search the backpack. Among other things, the backpack contained the keys to his residence.

At 12:28:05, Inv. Leitzen explained to an officer at the top of the stairs he is going to the basement to retrieve the backpack. At 12:28:24, a police officer at the bottom of the stairs explained how "fire," presumably the EMTs, had entered the basement. At 12:28:35, an officer knocked on the door at the top of the steps, i.e., the back door to the other residence in the house. At 12:29:08, Inv. Letizen spoke to Inv. Soppe,[8] who informed Inv. Leitzen about drug paraphernalia in plain view in the residence: syringes,

---

[8] I believe this is Inv. Soppe because the affidavit reports that Inv. Soppe interviewed Defendant and Inv. Leitzen's video shows Inv. Leitzen tell this officer to talk to Defendant. Furthermore, it appears to be one of the investigators Inv. Sitzmann identified in the video during his testimony. (Sitzmann Hr'g Test. at 64.)

11

tinfoil, pipes, gem baggies, and white powder on a scale. (*Id.* at 12:29:11.) Inv. Leitzen then asked Inv. Soppe to see if "he" (presumably Defendant) "will give us consent." (*Id.* at 12:29:26.)

Inv. Leitzen asked PF about the location and description of the backpack and headed to the basement. (*Id.* at 12:29:33.) A uniformed police officer was immediately in front of Inv. Leitzen as they walked into the residence from the staircase. (*Id.* at 12:29:58.) Inv. Leitzen and the uniformed officer used their flashlights as they looked for the backpack. They ruled out a duffle bag (12:30:25) and Inv. Leitzen located the backpack at 12:30:41. Inv. Leitzen described the drug paraphernalia he observed on a stand and described them as being in plain view. (*Id.* at 12:30:47-12:31:07[9].) At 12:31:05, the uniformed officer continued to shine his flashlight toward darkened areas of the room. A second uniformed officer led Inv. Leitzen out of the basement and up the stairs. (*Id.* at 12:31:29.)

Inv. Leitzen then confirmed with PF he had retrieved his backpack and searched it. (*Id.* at 12:31:50.) When the backpack proved to contain nothing of evidentiary value, PF was permitted to leave. (*Id.* at 12:34:53.) Inv. Leitzen then began speaking on the phone with someone, presumably Inv. Sitzmann, because he says, "Are you still at the office?" "Soppe went up to talk to him" and describes the evidence Inv. Leitzen had observed in the residence that appears in paragraph 2 of the warrant affidavit. (*Id.* at 12:34:59 - 12:35:56.) At 12:35:12, Inv. Leitzen explained that if Inv. Soppe cannot obtain Defendant's consent they would need to "bang out a search warrant."

At 12:36:11, Inv. Leitzen muted his camera and the video recorded silently until 12:51:44. Inv. Leitzen paced on the driveway next to the residence and he interacted with another uniformed officer. Then he approached the back door of the residence at

---

[9] Listening closely at this point, I could hear Inv. Leitzen mention "syringes," "plain view," "tin foil," and "burn marks."

12:44:22 and stood in a common area at the top landing of the basement stairs. Inv. Leitzen's microphone was still muted when the upstairs resident came to the back door and let him into the upstairs residence where he, another uniformed officer, the upstairs resident, and, at times, a cat gathered around the resident's computer. This gap in the audio is 15 minutes and 30 seconds. Inv. Leitzen told two uniformed officers they could leave at 12:52:45. From 12:53:07 to 12:54:43, Inv. Leitzen muted his body camera microphone again. In this instance, it appears he was socializing with the departing officers about mutual acquaintances when he muted his microphone. At no time did Inv. Leitzen explain why he turned off his microphone.

Inv. Leitzen again muted his microphone at 12:55:50 and walked down the stairs and into the basement. He began to shine his flashlight into areas of the basement. Another plain clothes investigator, Inv. Williams, accompanied him.[10] They appeared to focus on the stand with the syringes and other paraphernalia at 12:56:32. At 12:57:38, Inv. Williams shined his flashlight on a counter or partially opened drawer. At 12:58:20-28, Inv. Williams adjusted one of the lights in the residence to shine more light in an area he was looking into. At 12:59:26, a light above a workbench was turned on. During this time the investigators were not opening drawers or looking under beds, but they were shining lights and craning their necks, evidently to facilitate their view of whatever might be visible. There followed an extended period of standing around until 13:11:15 when Inv. Williams began inspecting a workbench with a flashlight. At 13:11:50, Inv. Williams used his flashlight to inspect some papers or packaging on the floor that he manipulated with his foot.

_____

[10] At the hearing, Inv. Sitzmann was asked to identify the two investigators that accompanied Inv. Leitzen into the basement. (Sitzmann Hr'g Test. at 64.) I have used this identification to follow the officers in the video, but they are dressed very much alike and cross back and forth at different portions of the video.

13

Inv. Soppe entered the room at 13:12:21. At 13:12:35, Inv. Williams manipulated an object on the workbench and lifted a jug to examine it before he put it back. At 13:12:52, Inv. Soppe began his flashlight-aided inspection of the room. At 13:15:10, Investigators Soppe and Williams manipulated and peered into a duffle bag. By 13:17:23, Inv. Soppe had taken a seat on chair that was in the residence. At 13:22:39, Inv. Leitzen found a chair to sit on and thereafter his camera appeared to be blocked (or at least out of position) until the video concludes at 13:27:09. Thus, the last gap in audio is approximately 32 minutes.

Judge Bitter executed the search warrant at 1:46 p.m., i.e., approximately 19 minutes after the Inv. Leitzen's body-cam video concluded.

### III. DISCUSSION

#### A. The Parties' Arguments

Defendant argues that the search warrant affidavit contains information gleaned by Inv. Leitzen during his warrantless search and those observations must be excised from the warrant application. (Doc. 28-2 at 4.) Defendant argues any exigent circumstances that might have justified law enforcement's entry no longer existed by the time Inv. Leitzen had entered because Defendant had left with medical personnel. (The Government does not argue exigent circumstances still existed.) Defendant argues that Inv. Leitzen did not have consent to enter and/or search the apartment. (Again, the Government does not argue to the contrary.)

Defendant asserts that if paragraph 2 of the affidavit (i.e., the information attributed to Inv. Leitzen) is excised, the remainder of the warrant fails to establish probable cause for the search. The remainder of the affidavit, Defendant points out, makes no reference to drug paraphernalia. Moreover, the affidavit makes no mention of Inv. Sitzmann's training, experience, and opinions regarding the likelihood a drug user

14

overdosing inside his apartment and leaving evidence of drug usage or leftover drugs. Defendant argues that without more, the application is merely conclusory.

Defendant also asserts that the *Leon* good-faith exception does not apply because, absent the statement about having seen evidence in the apartment, belief in the existence of probable cause was unreasonable.

The Government makes no attempt to justify Inv. Leitzen's warrantless presence in Defendant's apartment. At the hearing, the Government stated, "the argument here is not that we concede Leitzen lacked justification for the initial entry. The government's position is that even without paragraph 2 of the warrant application, probable cause exists." (Hr'g Tr. at 74.) When pressed about whether the Government was arguing that Inv. Leitzen was justified in entering the residence, the Government stated it is not. (*Id.*) Whether the Government is conceding the point or not, its analysis starts with the proposition that "[e]ven without Paragraph 2 of the Search Warrant Application, the Remaining Paragraphs Support Probable Cause." In support of this argument, the Government points to the following information it believes the affidavit established:

> 1. On October 14, 2024, at 12:09 pm, first responders were dispatched to [XXXX] Clarke Drive, in Dubuque, Iowa, for a report of a possible heroin overdose. Officers arrived and located the defendant unconscious in the basement. Officers then administered Naloxone which caused defendant to regain consciousness. The defendant was subsequently transported to Finley Hospital for additional treatment.
> 2. [PF] was identified as the 911 caller after defendant became unconscious. [PF] reported that he did not see defendant use illegal narcotics, but that defendant appeared under the influence when [PF] arrived at defendant's residence.
> 3. That Defendant resides in the basement of at [XXXX] Clarke Drive.
> 4. Investigators spoke with defendant at Finley Hospital and defendant stated he did not know what he took but that he did use "something" to attempt suicide.

5. That the affiant knows Naloxone will only be effective on a person with opiates in their system and that Naloxone works by blocking the effects of the opiates on the brain to restore breathing.

6. That the affiant believes there is evidence of drug use, which may have contributed to defendant's apparent drug overdose, inside the residence of [XXX] Clarke Drive, Dubuque, Iowa.

(Doc. 33 at 6-7.) The Government argues this information shows Defendant used an opiate because he was effectively revived by Naloxone. The Government argues that it is "reasonable to infer," based on the foregoing, that the drug use occurred at Defendant's residence. Furthermore, the Government asserts this information "supports a reasonable belief that an opiate may remain at the location where defendant overdosed." (*Id.* at 8.)

The Government finally asserts that even if the warrant is not supported by probable cause, the Court should deny the motion because "the officers executing the warrant possessed an 'objectively reasonable' belief in the warrant's validity." (*Id.*) (citing *United States v. Leon*, 468 U.S. 897, 918-20 (1984)). Along with other cases discussed below, the Government relies on *United States v. Cannon* which states,

For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, the detectives' prewarrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (quoting *White*, 890 F.2d at 1419). If "the officers' prewarrant conduct is 'clearly illegal,'" the good-faith exception does not apply." *Id.* (quoting *United States v. O'Neal*, 17 F.3d 239, 242-43 n.6 (8th Cir. 1994))

The Government's argument regarding why the investigators' prewarrant entry into Defendant's residence was "close to the line of validity" is somewhat difficult to discern. As stated above, without conceding the search was unlawful, the Government offers no justification that would make the investigators' presence in Defendant's residence lawful. The Government instead offers justifications in an effort to place the

16

investigators' conduct "close to the line of validity." The Government first seems to assert that the investigators' possession of significant evidence of legally obtained probable cause prior to entering the residence, helps in this effort. (Doc. 33 at 10.) Second, the Government seems to assert that Inv. Leitzen felt pressure to accommodate PF by retrieving his backpack and searching it so PF could leave. (*Id.*) Third, although the argument is not fleshed out, the Government implies that Inv. Leitzen was only going where officers had previously gone when exigent circumstances had previously existed:

> An investigator subsequently entered shortly after the defendant left the basement apartment and observed used syringes, burnt tin foil, a glass pipe with burnt resident on the bad, and a digital scale with a gem bag containing a white powder on top. Officers' initial entry was warranted by the exigent circumstances of the defendant overdosing on opiates.

(*Id.*)

At the hearing, the Government pointed out that Inv. Sitzmann's affidavit did not include any information that investigators may have learned while they waited in Defendant's apartment for the warrant. (Hr'g Tr. at 74.)

## B.   *Relevant Law*

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quotation omitted). "[A]n entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and sanctity of the home, and justify the same level of constitutional protection." *Mahlberg v. Mentzer*, 968 F.2d 772, 775 (8th Cir. 1992) (quoting *Payton*, 445 U.S. at 588). Therefore, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). This protection begins at the entrance to the

17

dwelling. See *United States v. Vance*, 53 F.3d 220, 221-22 (8th Cir. 1995) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house.") (Quoting *Payton*, 445 U.S. at 590)). Although warrantless searches and seizures inside a home are presumptively unreasonable, there are exceptions to the warrant requirement "because the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City,* 547 U.S. at 403 (quotations omitted).

The simple, baseline definition of a "search" under the Fourth Amendment is when "the Government obtains information by physically intruding on persons, houses, papers, or effects." *Florida v. Jardines*, 569 U.S. 1, 5, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) (quotation omitted). A search also occurs when there is official intrusion into something "an individual 'seeks to preserve [ ] as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Carpenter v. United States*, 585 U.S. 296, 304, 138 S.Ct. 2206, 2213, 201 L.Ed.2d 507 (2018) (quoting *Smith*, 442 U.S. at 740, 99 S.Ct. 2577)). When physical intrusion on a constitutionally protected area is present in a case, it is unnecessary for the Court to "inquire about the target's expectation of privacy." *Grady v. North Carolina*, 575 U.S. 306, 309, 135 S.Ct. 1368, 1370, 191 L.Ed.2d 459 (2015) (per curiam).

Evidence obtained as a result of an unconstitutional search or seizure must be suppressed as well as any evidence later discovered to be an illegal "'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). "Any evidence secured through an unreasonable, hence illegal, search and seizure may not be used in a federal prosecution . . . nor may the fruit of such tainted evidence be admitted against the defendant whose privacy rights were originally violated." *Conner*, 948 F. Supp. at 829 (citing *Weeks v. United States*, 232 U.S. 383 (1914); *Wong Sun*, 371 U.S. at 484-88)).

Ordinarily, "[e]vidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, 'cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011) (quoting *United States v. Calandra*, 414 U.S. 338, 347, (1974)). The exclusionary rule is subject to an exception "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," even if the warrant is subsequently invalidated. *Leon*, 468 U.S. at 920. The Eighth Circuit has held:

> We have applied *Leon* where, as here, the search warrant application cites information gathered in violation of the Fourth Amendment. *See, e.g.*, *United States v. Kiser*, 948 F.2d 418, 421 (8th Cir. 1991); *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989) ("[E]vidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid."). For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, the detectives' prewarrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (quoting *White*, 890 F.2d at 1419). If "the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." *Id.* (quoting *United States v. O'Neal*, 17 F.3d 239, 242–43 n. 6 (8th Cir. 1994)).

*United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013).

In *Cannon*, the Court assumed law enforcement violated the defendant's rights by initially entering a place where he had a reasonable expectation of privacy. *Id.* at 413-14. Indeed, for *Leon* to apply in the instant case, then Inv. Leitzen's entry into the home must have violated Defendant's Fourth Amendment rights.

19

*C.*     *Analysis*

*1.*     ***Whether Inv. Leitzen's entry into the basement violated Defendant's***
         ***Fourth Amendment rights***

While the Government does not quite concede this point, neither does it attempt to justify Inv. Leitzen's warrantless presence in the basement when he viewed the evidence later included in paragraph 2 of Inv. Sitzmann's affidavit. As stated above, an unwarranted search of a home is presumptively unreasonable. Here, there is no justification for Inv. Leitzen's presence in the basement that passes constitutional muster, even if he meant well in helping PF reclaim his backpack. In *United States v. Ackerman*, the Government unsuccessfully attempted to justify a "second look" under *United States v. Lacey*, 530 F.2d 821, 824-825 (8th Cir. 1976). No. 21-CR-2023-CJW, 2022 WL 3574318, at *13–14 (N.D. Iowa June 10, 2022), *report and recommendation adopted*, No. 21-CR-2023 CJW-MAR, 2022 WL 3011136 (N.D. Iowa July 29, 2022), *aff'd,* 87 F.4th 925 (8th Cir. 2023). While the Government has not raised *Lacey* in the case at bar, to the extent the Government is attempting to justify Inv. Leitzen's search as a permissible "second look," I will address it. As I stated in my Report and Recommendation in *Ackerman*,

> In *Lacey*, Drug Enforcement Agents seized currency for safekeeping when the apartment they lawfully searched could not be secured. *Id.* at 822. The serial numbers on the currency were recorded on an inventory slip. *Id.* When the agents subsequently examined the inventory slip, they discovered serial numbers of currency used as "buy money." *Id. Lacey* held,
>
>> [T]he access of the DEA agents to the currency was lawful. We cannot say that the subsequent listing of the serial numbers of the currency as part of the inventory procedure invaded any reasonable expectations of privacy. We therefore hold that no unreasonable search or seizure occurred when the DEA agents simply transcribed into a permanent form serial numbers of currency which they had already lawfully observed.

20

> *Id.* at 825. I cannot read *Lacey* and subsequent cases that cite it to stand
> for the startling proposition that, having completed a valid protective sweep
> during which incriminating evidence was encountered, law enforcement
> may lawfully go back for a "second look" without a warrant or an exception
> to the warrant requirement. Thus, I conclude that Captain Herbst's
> observations in the basement do not qualify as a permissible "second look"
> at the property.

*Id.*

Thus, Inv. Leitzen's presence in the basement when he observed the evidence constitutes a search, that is he "obtain[ed] information by physically intruding on persons, houses, papers, or effects." *Jardines*, 569 U.S. at 5. Inv. Leitzen's entry into the basement and concomitant search beginning at 12:29:33 is clearly a violation of Defendant's Fourth Amendment's rights and the information obtained during this search was used to support the warrant.

### 2. *Whether the warrant affidavit contains probable cause without the evidence attributed to Inv. Leitzen*

When applying the exclusionary rule, "[t]he sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that information." *Davis*, 760 F.3d at 903. When faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause. *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir.2005). If an affidavit in support of a search warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,'" probable cause exists and a warrant may issue. *United States v. Warford*, 439 F.3d 836, 841 (8th Cir.2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

21

Here, I conclude the affidavit does not contain probable cause absent paragraph 2, the information supplied by Inv. Leitzen. To reiterate: the affidavit established that Defendant was located unconscious in his apartment, and he recovered in response to Naloxone. Defendant was not seen using narcotics, but he appeared to be unconscious and he had mentioned a suicide attempt. These statements alone do not create a fair probability that contraband or evidence of a crime would be present. The Government asserts that it "makes sense that the drug use under these circumstances occurred at defendant's residence." While I have no doubt that drug users often use drugs at home, overdoses are not so commonplace, and the habits of drug users are not so well known, that a reviewing judge could look at the facts in the affidavit and conclude there was a fair probability that Defendant used drugs at home *and* that there would be contraband present.

Moreover, this is not a case where the Court is called upon to determine whether probable cause could be supported with the sort of opinions Inv. Sitzmann offered at the hearing regarding the habits of opioid users and the likelihood of finding residue or other evidence of criminal activity at the site of an overdose. No such information was included in the affidavit and, as Inv. Sitzmann admitted, he would not expect a judge issuing a warrant to know the sort of information he had amassed professionally regarding how long it takes for an overdose to occur depending on the manner of ingestion and where overdoses occur. (Sitzmann Hr'g Test. at 59-60.) Because information about where and how overdoses regularly occur was not within the four corners of the affidavit, it cannot be considered as part of probable cause. In fact, Inv. Sitzmann's testimony, although perfectly credible and properly founded on his training and experience, tends to undercut the notion a judge could find probable cause simply by inference and common sense. In other words, Inv. Sitzmann was able to explain when and how overdoses occur

22

only by virtue of his training and experience. It is not reasonable to expect the judge could reach the same conclusions merely by common sense or inference.

### 3. *Whether the good faith exception to the exclusionary rule applies*

As this Court has previously noted, the focus at this juncture is not whether the warrant, stripped of its unconstitutionally seized contents, was close enough to the line of validity that it was supported by probable cause, but "whether the officers' prewarrant conduct is close enough to the line of validity to justify a good faith belief that what they were doing was lawful." *United States v. Zarate*, No. 18-CR-2073-CJW-MAR, 2019 WL 3459236, at *6 (N.D. Iowa July 31, 2019)

The Government's brief does not focus much on why it believes law enforcement's prewarrant actions were "close enough to the line of validity," other than to point to the unchallenged portions of the affidavit and PF's desire to retrieve his backpack. (Doc. 33 at 10-11.) Nor would it be easy to focus on Inv. Leitzen's justification. Inv. Leitzen was not called to testify and the Government has not pointed to any justification that might be attributed to an objectively reasonable officer.

Nevertheless, at the hearing, the Government argued:

So it's the government's position that, effectively, these officers, between Mr. Ferguson's statements, between that officer's statements, more or less already had probable cause. Now, they didn't get it to the search warrant application, certainly. That did not happen. But I think that goes towards the closeness to the validity -- closeness to the line of validity here and objectiveness -- objective reasonableness of the subsequent search.

(Hr'g Tr. at 81.) Perhaps one way of restating this position is that law enforcement had other, untainted probable cause that, for whatever reason, was not included in the warrant application. I do not believe the Government is arguing that because law enforcement

23

had other information that might[11] have supported probable cause, the Court should find the affidavit was sufficient. On the other hand, it is far from obvious how other evidence of probable cause that never made it into the affidavit renders it objectively reasonable to enter the home or to later believe the warrant was valid.

At the hearing the Government also discussed *United States v. McClain*, 444 F.3d 556 (6th Cir. 2005), *United States v. White*, 890 F.2d 1413 (8th Cir. 1989), and *United States v. O'Neal,* 17 F.3d 239 (8th Cir. 1994), in addition to *United States v. Cannon*, 703 F.3d 407 (8th Cir. 2013), which it cited in its brief, to support its position regarding where this case sits in proximity to the line of validity. I will discuss each case in turn.

In *United States v. McClain*, Defendant sought to suppress evidence of a marijuana growing operation in a private residence. Two patrol officers discovered evidence of the crime when they became "concerned" of a possible burglary and decided to "clear" the house. 444 F.3d 556, 560 (6th Cir. 2005). The information gleaned by these officers was used by the drug task force to obtain warrants that led to drug trafficking charges. The district court granted the defendant's motion to suppress because the warrantless

---

[11] I use "might" advisedly. Inv. Leitzen's video camera and Inv. Sitzmann's testimony certainly make one wonder why law enforcement did not rely on evidence from a patrol officer, EMT, or perhaps Inv. Soppe who might have been in the basement under exigent circumstances. While Inv. Soppe mentions items in "plain view" (Def. Exhibit B at 12:29:07-18), he does not affirmatively state that he was the person who saw the evidence in plain view or that he saw it when he was justified in being in the basement. On the contrary, it appears that Inv. Soppe entered the basement at 12:20:02 (i.e., before the warrant was issued and after Defendant left the scene.) Inv. Soppe then reported what he had seen to Inv. Leitzen about 9 minutes later. Thus, it would be mere conjecture to conclude there was other evidence that could have supported probable cause and that might have been legitimately included in the warrant. Defendant's apartment seems relatively small and the drug paraphernalia was described as being in plain view, but there is no evidence anyone lawfully observed it. (At 12:52:38-40, one patrol officer said, although jokingly, "I didn't see anything. I don't want to go to court.") More to the point, the existence of other possible evidence of probable cause does not change the facts that Inv. Leitzen entered without a warrant or other justification and the evidence he reported was included in the affidavit.

24

search violated the Fourth Amendment and *Leon* did not apply. The Sixth Circuit agreed there was no probable cause, but found the good faith exception applied "because the officers who sought and executed the search warrants acted with good faith, and because the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable." *Id.* at 566.

> The facts surrounding these officers' warrantless entry into the house at 123 Imperial Point were not sufficient to establish probable cause to believe a burglary was in progress, but we do not believe that the officers were objectively unreasonable in suspecting that criminal activity was occurring inside McClain's home, and we find no evidence that the officers knew they were violating the Fourth Amendment by performing a protective sweep of the home. More importantly, the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search, and Officer Murphy's warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search.

*Id.* The case at bar is readily distinguishable from *McClain*. In *McClain* the patrol officers were wrong about the justification for their entry, but they had a good faith belief they were justified in doing so. Here, Inv. Leitzen's video, however, includes his acknowledgement after entering the basement that without consent, law enforcement would have to "bang out" a warrant for the search. Because Inv. Leitzen did not testify, discerning any further rationale for his entry is somewhat conjectural. Inv. Leitzen seems to have been trying to accommodate PF's desire to reclaim his backpack and leave, but this hardly amounts to a good faith belief that he was justified in doing so.

The Government's supposition that law enforcement already had probable cause when Inv. Leitzen entered the basement is somewhat difficult to fit into this framework. Maybe Inv. Letizen assumed the ultimate warrant application would rely on someone else's view of the drug paraphernalia, e.g., an EMT or a patrol officer who was assisting

with the emergency response.  This, however, is also mostly conjecture because there is little evidence about why Inv. Leitzen entered the basement.  At the risk of setting up straw men, I find it hard to see how the possibility that someone else would ultimately supply the probable cause for an admittedly necessary warrant application creates a good faith belief in Inv. Leitzen that he could enter the basement.

In *United States v. White*, 890 F.2d 1413 (8th Cir. 1989), two law enforcement officers stopped a defendant without reasonable, articulable suspicion to justify his detention and seizure of his luggage.  *White* held:

> The government argues, however, that this conclusion does not necessarily end this case.  We agree.  The officers did not open and search the luggage until they had prudently obtained warrants.  This step, which the law encourages, brings into play the rule of *United States v. Leon*, supra, which the government cites: evidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid.  This case fits the rule.  We believe the Fourth Amendment was violated, but we also believe the facts of this case are close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.  The purchase of the ticket for cash, plus the incremental effect of the other factors present in this case, pushes this case into the gray area created by *Leon*.  Accordingly, it was not error to allow the fruits of the search to come into evidence, and the conviction must be affirmed.

890 F.2d at 1419.  Thus, in *White*, the Government was able to point to facts that (although ultimately determined to be insufficient for "reasonable, articulable suspicion") could make a reasonable officer think his conduct had been legal.  No such facts are present here.

*United States v. O'Neal,* 17 F.3d 239 (8th Cir. 1994), which relies on *White,* is also not helpful to the Government.  In *O'Neal* two officers stopped the defendant at a bus station and seized his bag for a canine sniff that turned up crack cocaine.  *O'Neal*

26

rejected application of *Leon* on the grounds that the officers had a good faith belief in the warrant's validity. In a lengthy footnote, *O'Neil* explained why prewarrant illegality cannot be dismissed so readily:

> In *United States v. White,* 890 F.2d 1413 (8th Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990), this Court held that the *Leon* good-faith exception does apply to some searches conducted under a warrant based on evidence obtained in violation of the Fourth Amendment. *See also United States v. Kiser,* 948 F.2d 418 (8th Cir.1991), *cert. denied,* 503 U.S. 983, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992). We must, of course, follow *White.* Neither *White* nor *Leon,* however, are unqualified in their application. The Supreme Court in *Leon* stated that "the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." 468 U.S. at 922–23, 104 S.Ct. at 3420 (citation and footnotes omitted). In *White,* this Court emphasized that although the facts failed to demonstrate reasonable, articulable suspicion, the facts were "close enough to the line of validity" that the officers were entitled to a good faith belief that reasonable suspicion existed. 890 F.2d at 1419. It was the closeness of the particular facts that "push[ed] this case into the gray area created by *Leon.*" *Id.* Here we find the opposite to be true. *No facts prior to the seizure of O'Neal's bag could reasonably support the seizure. No officer could in good faith believe that the facts would lead a reasonable person to believe that O'Neal was involved in criminal activity.*
>
> If the method by which evidence supporting a search warrant is seized is clearly illegal, then even under *Leon* and *White,* evidence obtained under the resulting warrant should be excluded. The Court in *Leon* stated that evidence obtained pursuant to a warrant should be suppressed only when "exclusion will further the purposes of the exclusionary rule." 468 U.S. at 918, 104 S.Ct. at 3418. That is the case here. In the Court's words, "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." 468 U.S. at 916, 104 S.Ct. at 3417. A magistrate issuing a warrant reviews affidavits for probable cause, *see Leon,* 468 U.S. at 921, not the methods by which the officers arrived at the facts presented. Indeed, a magistrate evaluating a warrant

application is in no position to pass upon the legality of any prior warrantless search. *See United States v. Vasey,* 834 F.2d 782, 789 (9th Cir.1987). Thus, when a magistrate errs in evaluating the sufficiency of the evidence supporting a probable cause determination, excluding evidence obtained in an ensuing search will serve little purpose. *Leon,* 468 U.S. at 916–17, 104 S.Ct. at 3417–18. Here, however, the issue is *police misconduct,* the target of the exclusionary rule as recognized in *Leon.*

If clearly illegal police behavior can be sanitized by the issuance of a search warrant, then there will be no deterrence, and the protective aims of the exclusionary rule will be severely impaired if not eliminated. *See* Craig M. Bradley, "The 'Good Faith Exception' Cases: Reasonable Exercises in Futility," 60 Ind.L.J. 287, 302 (1985) (quoted in 1 Wayne R. LaFave, *Search & Seizure* § 1.3(f) (2d ed. 1987)). LaFave adds that "when the warrant-issuing process leaves totally unresolved the lawfulness of the prior police activity, then there is no reason why that process should, via *Leon,* shield that activity from full scrutiny at the suppression hearing." LaFave, *supra,* § 1.3(f). We find that under the facts presented in this case, the magistrate's issuance of a search warrant did not sanitize the police misconduct in illegally seizing O'Neal's bag.

*Id.* at 242 n.6 (emphasis added.) Just as the officers in *O'Neal* could not in good faith justify the seizure of the bag, no officer in Inv. Leitzen's position could in good faith believe that he had a legal basis to enter the basement and make the search that led to his observations in paragraph 2.

Finally, *United States v. Cannon*, 703 F.3d 407 (8th Cir. 2013) does not help the Government's position. In *Cannon* a fire inspector asked to look in a locked area of a car dealership where the defendant worked and, as later became apparent, also resided at least part of the time. Ultimately the inspector saw what he believed was a child pornography operation and reported it to authorities. Two detectives arrived and saw suspicious material through the open door. One detective entered the area to confirm the fire inspector's observations but left after discovering a bed. *Cannon* concluded that the detective's inspection violated the defendant Fourth Amendment rights, but it was close

28

enough to the line of validity to make the good-faith exception applicable. The court reasoned:

> The good-faith exception applies in this case, however, because it was objectively reasonable when they first entered the rooms for Detectives Barrios and Hignite to believe that they simply were entering rooms that were part of a car dealership business, EZ Credit. Although there is some evidence that the detectives knew Cannon had the only key to the room, which could imply a privacy interest, other facts overwhelmingly suggested that Cannon had no such interest. The detectives had responded to a call about a potential child pornography operation at a car dealership, not a residence. When the detectives arrived at EZ Credit, it was open for business, there were cars for sale on the lot, and there were both employees and customers present. EZ Credit also is located in an area zoned for business use, where residential use is prohibited.
>
> Moreover, given Cannon's responsibilities as both a car detailer and night watchman, there are numerous explanations for the fact that he alone had a key unrelated to any potential privacy interest. The rooms could have been a storage space for toxic chemicals used to clean cars, or they could have housed expensive security equipment. In either case, it would be logical for Cannon to have the only key, but in neither case would it obviously follow that Cannon had a legitimate expectation of privacy in the rooms. After seeing the child's bed in the third room, Detective Barrios did determine that Cannon may have been living in the rooms, and therefore, might have a reasonable expectation of privacy in them. But at that point, Detective Barrios discontinued the search, exited the rooms, and obtained a search warrant.

*U.S. v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013). In addition, the detectives seeking the warrant disclosed to the judge when and how they became aware of the fact that the area they had already been in was a residence. *See United States v. Moya,* 690 F.3d 944, 948 (8th Cir.2012) ("In assessing whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances, including any information known to the officer but not included in the affidavit. . . .") (quoting *United States v. Grant,* 490 F.3d 627, 632 (8th Cir.2007)).

Unlike *Cannon*, the facts in the case at bar show no justification for any investigator to believe he could enter Defendant's residence without a warrant after the exigent circumstance of the overdose had been dealt with. On the contrary, Inv. Leitzen's statement that without Defendant's consent they would have to "bang out a warrant," shows he knew there was no valid basis to enter. Moreover, again unlike *Cannon*, Inv. Sitzmann's affidavit does not disclose that Inv. Leitzen learned of the presence of drug paraphernalia and possible contraband when he entered to retrieve PF's backpack. Rather, the affidavit leaves the possible inference that Inv. Leitzen learned the information during the emergency response.

While it is not clear from the appellate opinions whether the officers all testified, in each of the cases relied upon by the Government, there is discussion about what the officer actually believed or what a reasonable officer could have believed that made conduct close to the line of validity. In *Cannon*, the detectives "*believe[d]* that they simply were entering rooms that were part of a car dealership business, EZ Credit." 703 F.3d at 413 (emphasis added). In *White,* "an objectively reasonable officer could have believed the seizure valid." 890 F.2d at 1419. In *O'Neal*, "No facts prior to the seizure of O'Neal's bag could reasonably support the seizure. No officer could in good faith believe that the facts would lead a reasonable person to believe that O'Neal was involved in criminal activity." 17 F.3d at 243 n.6. Finally, *McClain* stated,

> [W]e do not believe that the officers were objectively unreasonable in suspecting that criminal activity was occurring inside McClain's home, and we find no evidence that the officers knew they were violating the Fourth Amendment by performing a protective sweep of the home. More importantly, the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search, and Officer Murphy's warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search.

444 F.3d at 566.

In contrast, the evidence in the case at bar tells the Court nothing about what Inv. Leitzen actually believed, and the Government's argument leaves the Court searching for any explanation of what an objectively reasonable officer might have believed to justify the prewarrant search of Defendant's residence. Therefore, I recommend that the Court conclude that the *Leon* good faith exception should not apply.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **grant** Defendant's Motion to Suppress. **(Doc. 28.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 28th day of October, 2025.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa